UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MICHAEL RILEY, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | Civil Action No. 14-cv-14401 |
| | * | |
| SEAN MEDEIROS, | * | |
| | * | |
| Respondent. | * | |

**MEMORANDUM AND ORDER**

August 16, 2016

BURROUGHS, D.J.

    In March 2007, a Plymouth Country grand jury returned indictments charging Michael

(the "Petitioner" or "Mr. Riley") and Carolyn Riley with murder in the first degree, in connection

with the December 13, 2006 death of their four-year-old daughter, Rebecca.[1] In 2010, Mr. Riley

and Carolyn were tried separately in Plymouth County Superior Court and in March 2010, Mr.

Riley was convicted of murder in the first degree committed with extreme atrocity or cruelty.

    Currently before the Court is Mr. Riley's petition for habeas corpus. His petition raises

three grounds for relief, each based on the alleged ineffective assistance of counsel. [ECF No. 1].

He claims that his trial counsel was ineffective by: (1) failing to investigate and challenge the

toxicology evidence supporting the Commonwealth's theory that Rebecca died of a Clonidine

overdose (Ground One); (2) not moving to preclude the Commonwealth from arguing that the

Petitioner and his wife concocted their children's symptoms of mental illness in order to collect

---

[1] Because the Petitioner, Carolyn Riley, and their children share the same last name, this
Memorandum and Order refers to all of them by their first names with the exception of the
Petitioner.

Supplemental Security Income benefits (Ground Two); and (3) delivering a closing argument

that did not effectively marshal the evidence (Ground Three). In his memorandum in support of

his petition, the Petitioner waived Ground Two [ECF No. 38 at 2, n.2], and therefore only

Grounds One and Three are before the Court. For the reasons stated herein, Mr. Riley's habeas

petition is <u>DENIED</u>.

## I.   Factual Background and Procedural History

In <u>Commonwealth v. Riley</u>, 467 Mass. 799 (2014), the Massachusetts Supreme Judicial

Court ("SJC") described the facts of this case, which this Court now "supplement[s] with other

record facts consistent with the SJC's findings." <u>Yeboah–Sefah v. Ficco</u>, 556 F.3d 53, 62 (1st

Cir. 2009) (quoting <u>Healy v. Spencer</u>, 453 F.3d 21, 22 (1st Cir. 2006)).[2]

The Petitioner and Carolyn had two children in addition to Rebecca: Gerard, aged eleven

at the time of Rebecca's death and Kaitlynne, aged six at the time of Rebecca's death in 2006.

<u>Riley</u>, 467 Mass. at 801. In August 2004, when Rebecca was a little over two years old, the

Petitioner and Carolyn took Rebecca to Dr. Kayoko Kifuji, a child psychiatrist who was already

treating Kaitlynne, and complained to Dr. Kifuji that Rebecca was very hyperactive, hardly slept,

and was violent towards her siblings. <u>Id.</u> at 801-802. Dr. Kifuji diagnosed two-year-old Rebecca

with attention deficit hyperactivity disorder ("ADHD") and prescribed her Clonidine, a

medication approved by the Food and Drug Administration to treat high blood pressure in adults,

but which is also used off-label to treat ADHD in children. <u>Id.</u> at 802. Roughly two months after

Rebecca received her ADHD diagnosis, the Petitioner initiated a claim for Rebecca to receive

Social Security disability benefits, which was denied. <u>Id.</u> In May 2005, the Petitioner and

---

[2] In a habeas case, state court "factual findings are entitled to a presumption of correctness that can be rebutted only by clear and convincing evidence to the contrary." <u>Rashad v. Walsh</u>, 300 F.3d 27, 35 (1st Cir. 2002) (internal quotations omitted).

Carolyn took Rebecca back to Dr. Kifuji, who diagnosed Rebecca, then aged three, with bipolar disorder, and prescribed her Depakote, a drug used to treat bipolar disorder in adults that Dr. Kifuji had previously prescribed for Kaitylnne. Id. Thereafter, the Petitioner requested reconsideration of the denial of benefits for Rebecca, which the Social Security Administration denied. Id. In December 2005, the Petitioner appealed the denial. The appeal had not been heard at the time of Rebecca's death. Id.[3]

In January 2006, Rebecca began attending preschool, where she showed persistent signs of overmedication throughout the school year: she was lethargic, needed assistance on the stairs because she was unsteady on her feet, and also needed help when getting off the school bus. Id. at 802-803. Rebecca exhibited similar symptoms of overmedication when she returned to school in the fall of 2006. Id. at 803.

Between the end of November and early December of 2006, having temporarily moved out, the Petitioner moved back in with Carolyn and their children. Id. At this point they were living in Hull, Massachusetts and Carolyn's half-brother, James McGonnell, his girlfriend, Kelly Williams, and her son were also living in the house. Id. Carolyn, at the Petitioner's direction, began to give the children their nighttime medications earlier in the evening—between 5 and 6 p.m.—and Rebecca would fall asleep within a half-hour. Id. at 803. She would sleep until around 6 a.m., then be up for approximately one and one-half hours, be given her morning dose of Clonidine, and go back to sleep until 11 a.m. or noon. Id. During this time, Rebecca's condition

---

[3] At the time of Rebecca's death, "Carolyn, Gerard, and Kaitlynne were each receiving Social Security disability benefits." Riley, 467 Mass. at 801. "Gerard was receiving his Social Security benefits based on his diagnoses of bipolar disorder and possible attention deficit hyperactivity disorder (ADHD). The record suggests that Kaitlynne's benefits were based on the same or similar diagnoses." Id. at 801, n.3.

at school worsened: she became more lackadaisical, did not engage with the other children or

staff members, and required an aide to sit behind her to prop up her body. Id.

On her last day at school, Friday, December 8, 2006, Rebecca appeared to have a cold.

Id. at 803. The cold continued on Saturday, and she developed a barking cough that sounded like

a croup cough. Id. at 803-804. On Sunday, Rebecca did not eat anything and her cough was

causing her to vomit. Id. Over the weekend and into the week, as Rebecca's condition worsened,

her parents consistently rebuffed her requests for help, often yelling or cursing at her to go away.

When others in the house insisted that the Petitioner and Carolyn call an ambulance or take

Rebecca to the doctor, they refused to or said that they planned to do so, but never did. The

events culminated Tuesday night into Wednesday morning:

> At approximately 10 p.m., Rebecca again walked down the hall to her
> parents' bedroom. The defendant opened the door, grabbed Rebecca by the
> arm, turned her around, pushed her back toward her bedroom, and yelled,
> "Go to your fucking room." Rebecca cried, calling for her mother and
> saying that she did not feel well. Rebecca kept returning to her parents'
> bedroom. After her parents turned Rebecca away from their bedroom
> several more times, McGonnell kicked the defendant's and Carolyn's door
> and, in a panicked tone, told them that they needed to call an ambulance.
> Williams picked up Rebecca, who was stiff, and brought the child back to
> her bedroom.

> At approximately 1 a.m. (now Wednesday, December 13), Blaine
> Groetzinger, a friend of Williams who was staying in the basement of the
> house, heard Rebecca faintly calling out for her mother in her bedroom. On
> hearing this, he knocked on McGonnell's door to tell him that he should get
> Carolyn. At the time, Rebecca was gurgling and choking, and when
> McGonnell went to her, Rebecca spit up a red liquid onto his pants.
> McGonnell went to the defendant's and Carolyn's door and kicked it in after
> nobody answered it; he then kicked their bed to awaken them. The
> defendant asked McGonnell what he wanted, and McGonnell said that
> Rebecca was worse and again brought up that they needed to take her to the
> emergency room, asking, "What if she dies?" According to McGonnell, the
> defendant acted like "[i]t was a big joke."

> Carolyn thereafter brought Rebecca into the bedroom she shared with the
> defendant. Rebecca was stiff, gasping for air, and moaning. At the

defendant's direction, Rebecca received at least one-half pill more of clonidine, and was placed on her parents' bedroom floor with a blanket and pillow. When the defendant and Carolyn awoke around 6:30 a.m. that morning, Rebecca was dead. Her body was stiff and cold, and a pink-tinged foamy liquid had secreted from her nose and mouth.

Id. 805-06.

Originally, the Petitioner and Carolyn were to be tried together in Plymouth County Superior Court. Id. at 807. On the first day of their joint trial, however, the Commonwealth assented to Carolyn's motion to sever. Id. Carolyn was tried first, from January to February 2010, and was convicted of murder in the second degree. Id. at 801, 807. The Petitioner was tried in March 2010, and on March 26, 2010, was convicted of murder in the first degree on a theory of extreme atrocity and cruelty. [S.A. 173].[4] He was sentenced to life imprisonment. [S.A. 147].

In February 2012, the Petitioner filed a motion for a new trial [S.A. 233-308], which the trial court denied. [S.A. 798-801]. In April 2014, the SJC affirmed the conviction [S.A. 1191-1209], and in July 2014, it denied Mr. Riley's petition for rehearing, [S.A. 1215].

Mr. Riley filed his petition for a writ of habeas corpus on December 15, 2014, raising the three grounds described earlier. [ECF No. 1]. The Respondent answered the petition on April 21, 2015. [ECF No. 15]. The Petitioner filed his Memorandum in Support of his Petition on October 5, 2015 [ECF No. 38], the Respondent opposed on January 22, 2016, [ECF No. 47], and the Petitioner replied on February 11, 2016. [ECF No. 50].

## II.   Standard of Review

The standard of review for a writ of habeas corpus application submitted by a person in custody pursuant to a state court judgment is set forth in the Antiterrorism and Effective Death

---

[4] "S.A." refers to the Supplemental Answer manually filed by the Respondent. [ECF No. 27].

Penalty Act ("AEDPA"). The writ may not be granted for any claim that was "adjudicated on the merits" in State court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Under this deferential standard, federal habeas relief may only be granted where it is shown that "the earlier state court's decision 'was contrary to' federal law then clearly established in the holdings of [the Supreme Court] . . . that it 'involved an unreasonable application of' such law . . . or that it 'was based on an unreasonable determination of the facts' in light of the record before the state court." Harrington v. Richter, 562 U.S. 86, 100 (2011).

Under the AEDPA, "clearly established Federal law" is limited to the holdings of the Supreme Court at the time of the underlying state-court decision. Williams v. Taylor, 529 U.S. 362, 412 (2000). Accordingly, a state court decision is contrary to clearly established Federal law if the "state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law," or if "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]." Id. at 405.

A state court decision involves an unreasonable application of clearly established Federal law where the state court's application of Supreme Court precedent is "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (quoting Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003)); see also Harrington, 562 U.S. at 102 ("[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable."). In other words, a state court decision unreasonably

applies clearly established Federal law where it "identifies the correct governing principle from [Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

Lastly, "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). "A state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301 (2010).

Habeas relief under the AEDPA is "intentionally difficult to meet." Woods v. Donald, 135 S. Ct. 1372, 1376 (2015) (internal quotations omitted). It "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Harrington, 562 U.S. at 102-03 (internal quotations omitted). To obtain habeas relief from a federal court, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103.

Both of the Petitioner's remaining habeas claims allege that his trial counsel was constitutionally ineffective. AEDPA review of an ineffective assistance claim is "doubly deferential." Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (internal quotations omitted). This is because a court reviewing a habeas ineffective assistance claim must assess the claim through the lens of both the AEDPA and Strickland v. Washington. Under Strickland—the clearly established Federal standard for ineffective assistance claims—counsel is "strongly presumed to

have rendered adequate assistance and made all significant decisions in the exercise of

reasonable professional judgment." 466 U.S. 668, 690 (1984). Accordingly, on habeas review,

"the question is not whether counsel's actions were reasonable. The question is whether there is

any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington,

562 U.S. at 105.

Strickland established a two-prong test for determining whether counsel's defective

performance violates the constitution:

> First, the defendant must show that counsel's performance was deficient.
> This requires showing that counsel made errors so serious that counsel was
> not functioning as the "counsel" guaranteed the defendant by the Sixth
> Amendment. Second, the defendant must show that the deficient
> performance prejudiced the defense. This requires showing that counsel's
> errors were so serious as to deprive the defendant of a fair trial, a trial whose
> result is reliable.

Strickland, 466 U.S. at 687. To satisfy this test, "the defendant must prove that counsel's

representation fell below an objective reasonableness standard and that there is a reasonable

probability that, but for counsel's unprofessional error, the proceeding's result would have been

different." Bell v. Cone, 535 U.S. 685, 686 (2002). Because an ineffective assistance claim under

Strickland is a mixed question of law and fact, when raised in a habeas petition, it is evaluated

under the "unreasonable application" clause of section 2244(d). Yeboah-Sefah, 556 F.3d at 70.

Thus, the reviewing court asks "whether the state court applied Strickland to the facts of

petitioner's case in an objectively unreasonable manner." Id.; see also Jewett v. Brady, 634 F.3d

67, 75 (1st Cir. 2011) ("[T]he pivotal question in a federal collateral attack under Strickland is

not whether defense counsel's performance fell below Strickland's standard, but whether the

state court's application of the Strickland standard was unreasonable, that is, whether fairminded

jurists would all agree that the decision was unreasonable.") (internal quotations omitted).

### III.    Ground One: Toxicology Evidence

In Ground One of his petition, Mr. Riley claims that his trial counsel rendered ineffective assistance by inadequately investigating and challenging the Commonwealth's theory that Rebecca's death was caused by an overdose of Clonidine. [ECF No. 1 at 5]. At trial, the Commonwealth had toxicology experts testify that Rebecca's postmortem femoral blood concentrations were indicative of a Clonidine overdose. Mr. Riley contends that his trial counsel should have done more to undermine the reliability of these blood measurements. Specifically, he claims that his trial counsel should have challenged three assumptions embedded in the Commonwealth's overdose theory: "1) that the postmortem femoral Clonidine level was representative of the level at the time of death, 2) that the range of volumes of distribution in children, a factor in the formula the toxicologists used to calculate dosage, is the same as for adults, and 3) that the postmortem whole blood femoral level would be the same as a serum level and therefore it could be compared to the therapeutic range." [ECF No. 38 at 24].

In support, Mr. Riley points to the testimony of two toxicology experts—Dr. Robert Middleberg and Dr. David Benjamin—who testified at Carolyn's trial, but not his. During Carolyn's trial, they opined that the postmortem femoral blood Clonidine levels measured in Rebecca were not representative of the level in her blood at the time she died, and that the blood measurements could not be used to reliably calculate the amount of Clonidine consumed by Rebecca. [S.A. 528-37, 550-60]. Mr. Riley also points to two peer-reviewed studies that purportedly undermine the usefulness of postmortem femoral blood testing, albeit not specifically for Clonidine. [S.A. 208-225]. Based on the expert testimony at Carolyn's trial and these two articles, Mr. Riley argues that his trial counsel did not adequately investigate the

toxicology issues in his case, and that counsel should have done more at trial to rebut the

Commonwealth's overdose theory.

### a.   SJC Decision

The SJC rejected Mr. Riley's claim of ineffective assistance under the miscarriage of

justice standard.[5] It found that trial counsel had effectively presented an affirmative answer to the

Commonwealth's overdose theory, namely, that Rebecca had died of pneumonia:

> A review of the trial record makes clear that this is not a case where, through
> defense counsel's lack of preparation and advocacy at trial, the defendant
> was deprived completely of a defense. . . . Rather, as the judge found, trial
> counsel effectively presented a theory about cause of death that served to
> provide a reasonable alternative to the Commonwealth's overdose theory.
> The defendant's theory, presented through a forensic pathologist, Dr.
> Arden, was that although the level of clonidine in Rebecca's blood clearly
> was elevated at the time of her death, an overdose of clonidine did not kill
> her, but rather she died of a fulminant necrotizing pneumonia—a
> pneumonia that became extremely serious and indeed fatal extremely
> quickly.

Riley, 467 Mass. at 809-10.

At trial, Mr. Riley's expert, Dr. Arden, did not testify that the postmortem femoral

samples were unreliable, but he did testify that the level found in Rebecca's blood was not likely

to be fatal, and that pneumonia was the cause of her death. "With respect to the elevated

clonidine level," the SJC noted, "Dr. Jonathan Arden testified that he did not consider it to be

---

[5] The SJC applied the miscarriage of justice standard, which is more favorable than the typical
constitutional standard, to determine ineffectiveness of counsel, because Mr. Riley had been
convicted of first degree murder. Riley, 467 Mass. at 807 (citing Commonwealth v. Gonzalez,
443 Mass. 799, 808 (2005) ("Because the defendant has been convicted of murder in the first
degree, we consider his claim of ineffectiveness of counsel to determine whether there exists a
substantial likelihood of a miscarriage of justice, as required under G.L. c. 278, § 33E, which is
more favorable to a defendant than the constitutional standard for determining ineffectiveness of
counsel.")).

significant in the analysis of cause of death because the medical literature, which had been cited and discussed by the Commonwealth's experts, indicated that although there were many examples of children receiving overdoses of clonidine, the number of deaths as a result of an overdose were very few and the amount of clonidine involved in those cases where death had occurred far exceeded twelve ng/ml." Id. at 810, n. 13.

This alternative theory that pneumonia killed Rebecca, the SJC found, was "far from an unsupported flight of fancy." Id. at 810. Not only had the "highly credentialed" Dr. Arden provided testimony in support, but one of the Commonwealth's own experts had also agreed on cross that a cause of death was pneumonia. Id. The SJC concluded that there was "no persuasive indication[] that the defendant's counsel presented the alternative explanation of cause of death because of lack of investigation of the toxicology evidence on which the Commonwealth was relying." Id. at 810-11. He retained Dr. Arden as an expert, vigorously attacked the validity of the Commonwealth's overdose theory through cross-examination, and emphasized that the use of Clonidine for ADHD had not been approved by the FDA, in an attempt to shift blame away from Mr. Riley and towards the prescribing doctor. Id. at 811.

Further, the SJC found that trial counsel had adequately investigated the Commonwealth's overdose theory. The SJC rejected Mr. Riley's argument that his trial counsel had been ineffective by not ordering the transcripts of Dr. Middleberg and Benjamin's testimony from Carolyn's trial and/or not having them testify. Until the night before trial, Mr. Riley and Carolyn were to be tried together, and as result, the SJC inferred that trial counsel must have been aware of the two expert's opinions. Id. at 812. Further, Mr. Riley's trial counsel used a report written by Dr. Middleberg during a cross-examination. Id. Accordingly, the SJC found that "trial counsel must have been aware of the thrust of these two experts' expected testimony."

Id. Not only that, but trial counsel also had the benefit of knowing that Carolyn's defense had not worked, given that she had been convicted of second degree murder.

In sum, the SJC found that "the defendant's trial counsel made a strategic decision to pursue a theory of defense that provided an affirmative answer to the Commonwealth's overdose theory, and with which one of Commonwealth's own experts basically agreed." Id. at 814. This strategic decision, the SJC concluded, was not manifestly unreasonable. Id.

### b. Standard of Review

Mr. Riley claims that the Court should review Ground One *de novo*. He argues that in state court he was not able to fully develop and present the evidence relevant to Ground One, and that therefore, the SJC did not "adjudicate it on the merits." [ECF No. 38 at 21-23]. In the state court post-conviction proceedings, Mr. Riley sought funds to retain a toxicologist to investigate the reliability of the Commonwealth's overdose theory. [S.A. 193-225]. Both the Superior Court and SJC denied his request. Mr. Riley argues that because he could not carry out this investigation and present the results to the state court, the state courts were missing important evidence, and therefore did not adjudicate his claim on the merits. The Court disagrees, and finds that Ground One should be reviewed under AEDPA's deferential standard.

"Section 2254(d) . . . demands an inquiry into whether a prisoner's 'claim' has been 'adjudicated on the merits' in state court; if it has, AEDPA's highly deferential standards kick in." Davis v. Ayala, 135 S. Ct. 2187, 2198 (2015). If a claim has not been adjudicated on the merits, then the Court reviews it *de novo*. Kater v. Maloney, 459 F.3d 56, 62 (1st Cir. 2006). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington, 562 U.S. at 99.

Generally, courts find that a claim was not "adjudicated on the merits" in state court where the state court decision fails to address the federal claim at issue. See e.g., Kater, 459 F.3d at 62 (reviewing claims in habeas petition *de novo* because "the SJC did not address those issues in federal constitutional terms"); Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001) (reviewing habeas claim *de novo* because "the federal claim was never addressed by the state courts"). "AEDPA imposes a requirement of deference to state court decisions, but [federal courts] can hardly defer to the state court on an issue that the state court did not address." Fortini, 257 F.3d at 47.

Here, there is no dispute that the SJC addressed Mr. Riley's federal ineffective assistance claim. Mr. Riley therefore advances a different reason why this Court should review Ground One *de novo*. Relying on Winston v. Kelly ("Winston I "), 592 F.3d 535 (4th Cir. 2010) and Winston v. Pearson ("Winston II "), 683 F.3d 489 (4th Cir. 2012), Mr. Riley argues that because the state courts did not allow him to retain a toxicologist to investigate the reliability of the Commonwealth's overdose theory, the state court reviewed a materially incomplete record, and therefore did not adjudicate his claim on the merits. In the Winston decisions, the Fourth Circuit found that the petitioner's ineffective assistance claim should be reviewed *de novo*, and not under § 2254(d)'s deferential standard, because the petitioner had been "hindered from producing critical evidence to buttress his . . . ineffectiveness claims . . . by the state court's unreasonable denial of discovery and an evidentiary hearing." Winston II, 683 F.3d at 501. The issue in Winston was whether the petitioner met Virginia's statutory definition of mental retardation, and therefore could not be executed. On habeas review, the district court ordered an evidentiary hearing, at which the petitioner produced for the first time an IQ test, taken when he

was 16, reflecting a score of 66.[6] In the <u>Winston</u> decisions, the Fourth Circuit found that this new

IQ test was vital to his claim, and that the record before the state courts had been materially

incomplete. As a result, the Fourth Circuit directed the district court to review his claim *de novo*.

2254(d) did not apply, because the "state courts did not afford [the petitioner] an evidentiary

hearing and thus passed on the opportunity to adjudicate his claim on a complete record."

<u>Winston II</u>, 683 F.3d at 502 (internal quotations omitted).

This case is not analogous to <u>Winston</u>. This Court, like the state courts, has denied Mr.

Riley's request for additional forensic review.[7] Accordingly, unlike in <u>Winston</u>, the record before

this Court is identical to the record that was before the state courts, and no vital information has

been revealed since the SJC decision that requires this Court to perform *de novo* review.

Moreover, even if the Court had allowed Mr. Riley to conduct further forensic review of the

toxicology evidence, it would not have warranted *de novo* review of the SJC's opinion. In

<u>Winston</u>, the newly adduced evidence "fundamentally altered" the petitioner's ineffective

assistance claim. <u>See</u> <u>Winston II</u>, 683 F.3d at 497. Without the newly discovered IQ score, the

record was silent on the most relevant fact. Here, no matter what evidence the forensic review

revealed, it would not have materially altered the <u>Strickland</u> analysis or rendered the state court

record materially incomplete. The state court record already included the testimony of the two

toxicology experts who appeared at Carolyn's trial. [S.A. 528-37, 550-60; <u>Riley</u>, 467 Mass. at

812, n.16]. The SJC had access to this testimony, knew that Mr. Riley's counsel had not elicited

similar testimony at his trial, and also knew that Carolyn's defense had not worked. Based on

this evidence, as well as the transcript of Mr. Riley's trial, the SJC had the record it needed to

---

[6] Under Virginia law, an individual must prove an IQ of 70 or below to prove a mental
retardation classification. <u>Winston II</u>, 683 F.3d at 494.
[7] <u>See</u> infra V.

assess the reasonableness of trial counsel's strategy and to adjudicate Mr. Riley's ineffective

assistance claim on the merits.

And in any event, the <u>Winston</u> decisions conflict with the Supreme Court's recent

decisions in <u>Harrington</u> and <u>Cullen</u>, which provide that (1) federal courts are to "presume[] that

the state court adjudicated the claim on the merits in the absence of any indication or state-law

procedural principles to the contrary," <u>Harrington</u>, 562 U.S. at 99, and (2) federal habeas review

under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the

claim on the merits," <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011). <u>See also</u> <u>Atkins v. Clarke</u>

642 F.3d 47, 49 (1st Cir. 2011) (noting that "to the extent [<u>Winston</u> is] inconsistent with <u>Cullen</u>

as to claims asserted under § 2254(d)(1) . . . [it is], of course, overruled"); <u>Ballinger v. Prelesnik</u>,

709 F.3d 558, 562 (6th Cir. 2013) ("While allowing a petitioner to supplement an otherwise

sparse trial court record may be appealing, especially where he diligently sought to do so in state

court, the plain language of [<u>Cullen</u>] and <u>Harrington</u> precludes it.").[8]

---

[8] Mr. Riley relies on a footnote in <u>Cullen</u>, in which the majority declined to "draw the line" between new claims and claims adjudicated on the merits, but noted that a hypothetical in Justice Sotomayor's dissent "involving new evidence of withheld exculpatory witness statements . . . may well present a new claim." <u>Cullen</u>, 563 U.S. at 186, n.10. The hypothetical in Justice Sotomayor's dissent posited a <u>Brady</u> claim, in which a state court orders that additional documents be disclosed—after the state court denied the <u>Brady</u> claim but before the time for filing a habeas petition has expired—and the new documents reveal that other exculpatory witness statements were withheld. <u>Cullen</u>, 563 U.S. at 214. Mr. Riley claims that the majority's footnote and Justice Sotomayor's hypothetical support his request for *de novo* review. The majority opinion, however, expressly rejected this position, stating that the federal habeas scheme leaves "primary responsibility" with the state courts, and that "[i]t would be contrary to that purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively *de novo*." <u>Cullen</u>, 563 U.S. at 182. Further, Justice Sotomayor's hypothetical is distinguishable, given that no new material evidence has emerged between the time of the SJC opinion and now.

Accordingly, § 2254(d)'s standard applies, and the Court asks only "whether the state court applied <u>Strickland</u> to the facts of petitioner's case in an objectively unreasonable manner." <u>Yeboah-Sefah</u>, 556 F.3d at 71.

### c. Discussion

A trial counsel's strategic decisions are rarely faulted under <u>Strickland</u>. <u>See</u> <u>Knight v. Spencer</u>, 447 F.3d 6, 15 (1st Cir. 2006) ("Under the first prong of <u>Strickland</u>, there is a strong presumption that counsel's strategy and tactics fall within the range of reasonable professional assistance, and courts should avoid second-guessing counsel's performance with the use of hindsight.") (internal quotations omitted). "Counsel has wide latitude in deciding how best to represent a client and benefits from a strong presumption that he or she rendered adequate assistance and exercised reasonable professional judgment in making all significant decisions." <u>Sleeper v. Spencer</u>, 510 F.3d 32, 38–39 (1st Cir. 2007) (internal quotations and citations omitted).

Under the "double deference" standard of review, the SJC's decision to deny Mr. Riley's ineffective assistance claim must be upheld. It was reasonable for the SJC to find that trial counsel made a strategic decision not to elicit more evidence concerning the toxicology results, in order to draw attention away from those results and towards the alternative pneumonia theory. Given the strength of trial counsel's alternative theory, the quality of trial counsel's questions on cross-examination, and the known outcome of Carolyn's trial, the SJC's rejection of Mr. Riley's ineffective assistance claim was reasonable. While it may be debatable whether trial counsel should have done more to challenge the reliability of the blood results, the strategy he chose to employ was not close to being "so patently unreasonable that no competent attorney would have made it." <u>Knight</u>, 447 F.3d at 15; <u>see also</u> <u>Harrington</u>, 562 U.S. at 89 ("Rare are the situations in

16

which the latitude counsel enjoys will be limited to any one technique or approach. . . . Counsel

is entitled to balance limited resources in accord with effective trial tactics and strategies.");

Janosky v. St. Amand, 594 F.3d 39, 49 (1st Cir. 2010) ("The relevant inquiry is not what defense

counsel might ideally have mounted but, rather, whether the choice that he made was within the

universe of objectively reasonable choices.").

 In the face of the strong evidence at trial that Rebecca had been given an excessive

amount of Clonidine before she died, albeit not necessarily enough to cause her death, and given

that the toxicology defense had not worked to exonerate Carolyn, Mr. Riley's trial counsel made

a reasonable strategic choice to dispute the cause of death rather than the exact amount of

Clonidine given to Rebecca.[9] There is no doubt that it would have been difficult to show that

Rebecca did not have excess Clonidine in her system at the time that she died. Therefore, instead

of arguing that the Commonwealth's toxicology evidence was unreliable and drawing attention

to that evidence, Mr. Riley's trial counsel relied on Dr. Arden's expert testimony to argue that

regardless of the exact amount of Clonidine given to Rebecca and found in her blood, it was not

a fatal amount, and that pneumonia, rather than a Clonidine overdose, was the actual cause of her

death.

 In support of this theory, Dr. Arden testified that, based on his review of the literature on

Clonidine exposure, "there are many examples of toxicity and overdose," but there are "[v]ery

---

[9] The evidence in support of the Commonwealth's overdose theory, in addition to the blood tests, included that Rebecca appeared over-medicated to school officials in the year preceding her death; that Carolyn had called Dr. Kifuji or the pharmacy on several occasions to replace prescriptions of Clonidine which had allegedly gone missing or were damaged; that even despite procuring extra Clonidine, there were still fewer pills remaining than there should have been; and that the Petitioner was heard on several occasions directing his wife, in an angry tone, to "give these fucking kids their medicine," or "shut the fucking kids up." Further, Rebecca's outward symptoms prior to her death were indicative of an overdose, e.g., her cold, clammy skin; and confused and lethargic demeanor. See Riley, 467 Mass. at 807.

few with serious effects" and "[v]ery, very few with fatalities in children." [Tr. XII at 103].[10] Of

the people he found in the literature that had previously died from a Clonidine overdose, all "had

blood concentrations that were substantially higher" than that found in Rebecca. Id. at 103.

Accordingly, he testified "with reasonable medical certainty . . . that Clonidine, although

elevated, did not cause [Rebecca's] death or contribute to her death," and that pneumonia had

caused her death. Id. 103, 112. As the SJC correctly found, this theory that pneumonia killed

Rebecca was "far from an unsupported flight of fancy." Riley, 467 Mass. at 810. Not only had

the "highly credentialed" Dr. Arden provided testimony in support, but one of the

Commonwealth's experts had also agreed on cross that a cause of death was pneumonia. Id. By

affirmatively presenting this alternative theory of cause of death, Mr. Riley's trial counsel

reasonably diverged from the strategy that had not worked in Carolyn's trial. In the face of the

considerable evidence that the Petitioner and Carolyn had regularly given Rebecca excessive

Clonidine, it was a reasonable trial strategy to accept that Rebecca had Clonidine in her system,

but to argue that it did not cause her death.

      The SJC also reasonably found that trial counsel was not ineffective by failing to move to

preclude the Commonwealth's toxicology experts under Commonwealth v. Lanigan, 419 Mass.

15 (1994), the Massachusetts equivalent of Daubert. The SJC concluded that this failure could

not constitute ineffective assistance because, "[i]n the circumstances, a motion for a Lanigan

hearing would have been futile." Riley, 467 Mass. at 813. This was not an unreasonable

conclusion. The SJC was warranted in finding that although the evidence Mr. Riley relies on—

namely, the testimony of Drs. Middleburg and Benjamin as well as the two peer-reviewed

---

[10] Citations to "Tr." refer to the trial transcript, which the parties provided to the Court. [ECF No. 53].

articles (that do not mention Clonidine)—may have cast some doubt on the Commonwealth's

blood results, it would not have formed the basis of a meritorious Lanigan motion.[11]

Even if this Court were to find that counsel was ineffective for not further investigating

or moving to preclude the toxicology evidence, Mr. Riley would not be entitled to habeas relief,

because he has not demonstrated prejudice.[12] To demonstrate prejudice under Strickland, "[t]he

defendant must show that there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different." 466 U.S. at 694. "Where . . . the

result of counsel's alleged failure to investigate is wholly speculative, Strickland's prejudice

prong is not satisfied." Janosky, 594 F.3d at 49. Here, the result of trial counsel's alleged failure

to further investigate the toxicology evidence is far too speculative to satisfy the prejudice prong

of Strickland. The blood results were only one piece of the Commonwealth's overdose theory, as

the Commonwealth also presented substantial non-scientific evidence of a Clonidine overdose.

As the Massachusetts Appeals Court found, when reviewing Carolyn's appeal, "the evidence

overwhelmingly supported the conclusion that Rebecca suffered a clonidine overdose regardless

of the precise amount administered before her death." Commonwealth v. Riley, 84 Mass. App.

Ct. 272, 277 (2013). Accordingly, even if trial counsel had taken additional steps to undermine

the Commonwealth's toxicology evidence, there is no reason to believe that the jury would have

reached a different verdict.

---

[11] Mr. Riley also challenges the SJC's decision to discredit the affidavit submitted by Mr. Riley's trial counsel, in which counsel accused himself of failing to effectively research the Commonwealth's overdose theory. See Riley, 467 Mass. at 811, n. 14. This decision to discount trial counsel's "fall-on-his-sword observations" was supported by the record, from which the SJC reasonably inferred that at the time of the trial, trial counsel was familiar with the potential problems in the Commonwealth's blood tests.
[12] The SJC did not address the prejudice prong of Strickland.

Finally, in support of Ground One, Mr. Riley cites several cases in which habeas relief was granted based on ineffective assistance claims. These cases are readily distinguishable.

First, Mr. Riley cites two Supreme Court cases—Rompilla v. Beard, 545 U.S. 374 (2005) and Wiggins v. Smith, 539 U.S. 510 (2003)—in which defense counsel was found ineffective for failing to investigate mitigating evidence prior to the sentencing phase of a murder trial. In both cases, defense counsels' failure to investigate could not have plausibly been construed as strategic choices; defense counsels' halfhearted investigations overlooked readily available and obviously important information, and caused them to put on cases that were incomplete and inaccurate. In Rompilla, for example, the petitioner was granted habeas relief where defense counsel did not review public information that was clearly important to defendant's case. Prior to the sentencing phase of the trial, the prosecution told defense counsel that it planned to use the facts surrounding a similar prior offense as part of its case, yet defense counsel did not review the file at all. If he had, he would have discovered substantial mitigating evidence, including mental health test results and entries about defendant's childhood that "would have destroyed the benign conception of Rompilla's upbringing and mental capacity counsel had formed . . . ." Rompilla, 545 U.S. at 376. This evidence, the Supreme Court found, would have "add[ed] up to a mitigation case that b[ore] no relation to the few naked pleas for mercy actually put before the jury." Id. at 393. In Wiggins, the Supreme Court granted habeas relief where defense counsel had "put on a halfhearted mitigation case," and where its failure to investigate "thoroughly resulted from inattention, not reasoned strategic judgment." 539 U.S. at 526. Defense counsel's limited review of defendant's records fell short of the professional standards prevailing at the time. Id. at 534. As a result, the only mitigating evidence that the jury heard was that the defendant had no prior convictions, and it did not hear about the petitioner's severe privation and abuse while in

the custody of his alcoholic mother; his physical abuse, molestation, and repeated rape while in

foster care; his time spent homeless; or his diminished mental capacities. Id. at 534-35.

Similarly, the three other cases cited by Mr. Riley—Gersten v. Senkowski, 426 F.3d 588

(2d Cir. 2005); Dugas v. Coplan, 428 F.3d 317 (1st Cir. 2005); and Draughon v. Dretke, 427

F.3d 286 (5th Cir. 2005)—involved defense counsel that failed to conduct any investigation or

retain any expert to rebut the government's theory at trial. In Gersten, a child abuse case,

"defense counsel failed to call as a witness, or even to consult in preparation for trial and cross-

examination of the prosecution's witnesses, any medical expert on child sexual abuse." 426 F.3d

at 607-608. As a result, counsel had "essentially conceded that the physical evidence was

indicative of sexual penetration" without conducting any investigation, and without having a

strong alternative defense. Id. at 608. The court found that "[t]here was nothing strategic about a

decision to concede the physical evidence, with no educated basis for doing so, in favor of an

uninvestigated and uninvestigable theories. . . ." Id. at 610-611.

In Dugas, an arson case, defense counsel "decided to accept the characterization of the

fire scene by the state's experts rather than conduct an independent investigation." 428 F.3d at

330. Defense counsel did not consult an expert on arson, and instead relied on his own

observations of the scene. As a result, "he failed to conduct a thorough investigation into the

most crucial aspect of the state's case." Id. at 329. The First Circuit found that defense counsel's

cross of the government's expert "demonstrated a clear lack of understanding of arson

investigation," and that he was "hopelessly unprepared to challenge the state's expert witnesses."

Id. at 331.

Finally, in Draughon, a murder case, the defense did not make any attempts to challenge

the government's theory that the defendant had shot the victim at close range, even though an

investigation into the forensics of the fatal bullet would have shown that it was likely fired from a greater distance. At trial, the defendant was the "sole source of evidence available to counter the prosecution's theory," and defense counsel's failure to investigate "set up an unchallenged factual predicate for the State's main argument that [the defendant] intended to kill." 427 F.3d at 296.

The situation in the present case is not comparable to these cases. Mr. Riley's habeas petition raises the mere possibility that his trial counsel could have bolstered his defense at trial. Unlike in the cases cited by Mr. Riley, the evidence at issue was not the only way to rebut the government's case, was not inherently material to the outcome, and trial counsel did not overlook it because of inattention or neglect. Rather, as the SJC reasonably found, Mr. Riley's counsel had a trial strategy, which, though ultimately unsuccessful, was sufficiently informed and responsive to the government's theory of the case to render his representation constitutionally effective. Trial counsel retained an expert who both challenged the government's theory (by opining that the amount of Clonidine measured was unlikely to be fatal) and offered a compelling alternative (that pneumonia had caused Rebecca's death). Moreover, his cross of the government's experts showed that he was generally familiar with the technical aspects of the Commonwealth's blood tests, and that he had not overlooked material information. Mr. Riley is therefore not entitled to habeas relief on Ground One.

## IV.    Ground Three: Closing Argument

In Ground Three of his petition, Mr. Riley claims that his trial counsel rendered ineffective assistance by failing to effectively marshal the evidence in his closing. Specifically, he contends that in his closing argument, trial counsel did not effectively present evidence to support the argument that a reasonable person would not have believed that Rebecca was at risk

of death. According to Mr. Riley, the closing should have referenced (1) the testimony of Kelly

Williams, who lived in the same house as Petitioner and Carolyn, that she "never once thought"

Rebecca was at risk of death Tuesday night; (2) the fact that no expert testified that it would have

been apparent to a lay person looking at Rebecca that there was a strong likelihood of death; and

(3) that when James McGonnell, Carolyn's half-sister, called the police, he never said that

Rebecca was dying or that an ambulance was needed. The petitioner raised these same three

claims in his motion for a new trial, which the SJC rejected:

> As for counsel's closing argument, he focused for some time on the question
> of what the defendant as Rebecca's parent reasonably would have
> recognized in the two days before her death, and as the defendant's appellate
> counsel acknowledges, he explicitly and correctly framed the question to be
> answered—"As of Tuesday night, as a reasonable parent, looking at their
> child, would they understand, or have reason to believe, that if they don't
> act to get medical attention, the child will die?"—and then attempted to
> answer it. That trial counsel perhaps might have presented a more focused
> answer does not mean that a substantial likelihood of a miscarriage of
> justice occurred.

Riley, 467 Mass. at 816. Again, analyzing the SJC's finding under the "double deferential"

standard of review, the Court finds that Mr. Riley is not entitled to habeas relief on Ground

Three.

"The right to effective assistance extends to closing arguments. Nonetheless, counsel has

wide latitude in deciding how best to represent a client, and deference to counsel's tactical

decisions in his closing presentation is particularly important because of the broad range of

legitimate defense strategy at that stage." Yarborough v. Gentry, 540 U.S. 1, 5 (2003). "Judicial

review of a defense attorney's summation is therefore highly deferential and doubly deferential

when it is conducted through the lens of federal habeas." Id.

Here, the three alleged omissions from trial counsel's closing do not warrant habeas

relief. First, Mr. Riley claims that the closing should have referenced testimony from Kelly

Williams that on Tuesday, Rebecca did not look like she was going to die. It is true that Williams testified at trial that she "never once thought" that Rebecca was going to die [Tr. VII at 145], and that this was not referenced in the closing. Williams also testified, however, that on Tuesday afternoon, Rebecca took a "sudden turn for the worse," appeared "cold and clammy," incoherent, and that she was "very concerned" about Rebecca and thought that she should go to the hospital. [Tr. VII at 17, 23, 183]. Based on this testimony, it was a reasonable tactical decision to limit reference to William's testimony rather than draw attention to it.

Second, Mr. Riley argues that trial counsel should have emphasized in his closing that no expert testified that Rebecca would have looked near death as a result of a Clonidine overdose. As the Respondent notes, however, at least one expert did testify that Rebecca would have appeared near death. The SJC repeated this testimony verbatim in its decision:

> [O]ne of the physician witnesses testified that "when a child comes in with even one or two extra tablets of clonidine, they look incredibly sick. They're not breathing well. Their heart rates are low. Their blood pressures are low. They look like *they are about to die*."

Riley, 467 Mass. at 824, n. 33 (emphasis in original).

Lastly, Mr. Riley claims that his trial counsel should have done more to attack the credibility of James McGonnell; specifically, he should have mentioned that although McGonnell claimed to have asked the Riley's, "what if she dies?" when he burst into their room at 1:00 a.m. Wednesday morning, he did not tell the police, while speaking to them, that they needed to bring an ambulance. While the closing did not reference these details, it did include numerous attacks on McGonnell's credibility. Trial counsel bluntly told the jury that "Jimmy McGonnell has no credibility," that "he's just a liar," and went on to describe numerous inconsistencies in McGonnell's testimony. [Tr. XIV at 30, 35, 38-40].

Thus, the SJC's decision to deny Petitioner's ineffective assistance claim was reasonable—of the three omissions Mr. Riley complains about, there was either a good reason for the omission or the omitted material was cumulative. Trial counsel has "wide latitude" to deliver a closing of his choosing, and the SJC reasonably concluded that the closing Mr. Riley's trial counsel gave was not ineffective. Accordingly, the Petitioner is not entitled to relief on Ground Three of his petition.

## V.     Renewed Motion for Authorization of Funds for a Forensic Toxicologist

On October 5, 2015, Mr. Riley filed a renewed motion for authorization of funds pursuant to the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A. [ECF No. 40]. He asked the Court to authorize an expenditure in the amount of $4,000 so that he could retain a forensic toxicologist, which he claims is "necessary to enable him to fully develop his ineffective assistance claim." Id. at 2. Mr. Riley filed an identical motion in May 2015, which the Court decided would be premature to resolve without the benefit of habeas briefing. [ECF No. 37]. Now that the habeas petition has been briefed, he has renewed his request.

Mr. Riley made a similar post-trial request for funds in state court, which the trial court denied. [S.A. 232]. In its opinion denying Mr. Riley's motion for a new trial, the SJC affirmed the trial court's decision to deny funds:

> Turning to the defendant's claim that the judge abused his discretion in denying the defendant's posttrial motion for funds to retain a forensic toxicologist, we discern nothing that justifies disturbing the judge's decision, especially in light of our conclusion that the defendant's motion based on ineffective assistance of counsel with respect to the toxicology evidence did not create a substantial likelihood of a miscarriage of justice.

Riley, 467 Mass. at 826–27. Mr. Riley does not challenge this decision in his habeas petition. Instead, through his renewed motion for funds, he asks this Court to authorize the same funds that the state courts would not.

The parties appear to disagree over what standard the Court should use to assess this motion. Mr. Riley claims that to grant the motion, the Court must only find that the funds are "necessary" pursuant to the CJA, which allows an indigent criminal defendant to request funding to "obtain investigative, expert, or other services necessary for adequate representation." 18 U.S.C. § 3006A(e)(1). Respondent claims that to be entitled to the funds, Mr. Riley must also show that there is "good cause" for the expert, pursuant to Habeas Corpus Rule 6(a), which establishes the ground rules for discovery in habeas cases and allows the federal habeas judge, "for good cause, [to] authorize a party to conduct discovery under the Federal Rules of Civil Procedure . . . ."

Mr. Riley is not entitled to the funds under either standard. The funds are not necessary to ensure that Mr. Riley receives adequate representation, and there is not good cause for allowing this additional expert discovery.

In Cullen v. Pinholster, the Supreme Court recognized that "evidence introduced in federal court has no bearing" on cases such as this, which seek review under 28 U.S.C. § 2254(d)(1), if the petitioner's claim has been adjudicated on the merits in state court. 563 U.S. 170, 185 (2011). Under Cullen, "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." 563 U.S. at 185. As a result, even if the Court allowed the forensic investigation, it could not consider the results on habeas review. Thus, allocating the funds and allowing additional expert discovery would serve no useful purpose. See Atkins, 642 F.3d at 47 (affirming denial of federal evidentiary hearing in habeas case based on Cullen, because it was "clear both that [petitioner's] petition for habeas corpus was brought under § 2254(d)(1) and that his ineffective assistance claim was adjudicated on the merits by the state court"); Kyle v.

Gansheimer, No. 5:11CV1395, 2011 WL 4566363, at *2 (N.D. Ohio Sept. 29, 2011) ("Allowing further factual development in this case would be futile because the Court could not consider any of the newly discovered evidence on review.").

Moreover, even if this Court could consider new evidence presented by the forensic toxicologist, there is not good reason to believe that a review of such evidence would change this Court's decision. See Donald v. Spencer, 656 F.3d 14, 15–16 (1st Cir. 2011) ("To demonstrate 'good cause' [petitioner] must present 'specific allegations that give a court reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'") (quoting Teti v. Bender, 507 F.3d 50, 60 (1st Cir. 2007)). As an initial matter, it would likely be duplicative of Drs. Middleberg and Benjamin's testimony at Carolyn's trial, as well as Dr. Middleberg's report [S.A. 760-767], which were already part of the state court and habeas records. Further, it would not undermine the reasonableness of the SJC's finding that trial counsel pursued a constitutionally effective trial strategy.

## VI. Conclusion

For the reasons stated herein, Mr. Riley's petition for habeas corpus is hereby <u>DENIED</u>.

Notwithstanding this Court's dismissal of the Petition, the Court finds that Mr. Riley is entitled to a certificate of appealability. Mr. Riley has "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), meaning that he has demonstrated that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 483-84 (2000) (internal quotation marks and citations omitted). "[A] claim can be debatable even though every jurist of reason might agree . . . that

petitioner will not prevail." <u>Miller-El</u>, 537 U.S. at 338. Accordingly, the Court hereby issues a

Certificate of Appealability as to both Grounds One and Three of Mr. Riley's habeas petition.

**So ordered.**

Dated: August 16, 2016

/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT COURT JUDGE
